CASE 17—ACTION BY THE COMMONWEALTH AGAINST TERRY MCGOVERN TO PREVENT A PRIZE-FIGHT IN THIS STATE.—JUNE 20.

# Commonwealth v. McGovern.

APPEAL FROM JEFFERSON CIRCUIT COURT, CHANCERY DIVISION.

FROM A JUDGMENT DISMISSING THE PETITION THE COMMONWEALTH APPEALS. REVERSED.

PRIZE-FIGHTING—EQUAL DIVISION OF REWARD—USE OF GLOVES—EFFECT—EQUITY—POWER TO ENJOIN.

Held: 1. Evidence examined, and *held* to show that a fight advertised to take place between certain persons would, if permitted, constitute a prize-fight.

2. The fact that the reward is to be equally divided between the combatants in a prize-fight does not legalize the transaction.

3. The use of gloves by combatants in a prize-fight will not make the contest any less a violation of the statute.

4. Kentucky Statutes, 1899, section 1289, which provides that it shall be the duty of "all judges of courts . . . on being informed . . . that such a fight (prize-fight) is about to take place . . . to suppress and prevent the same, and . . . in order to suppress or prevent the same they shall exercise all the powers vested in them for the prevention of crimes," authorizes a court of equity, in a suit by the Commonwealth, to enjoin one from permitting the holding of a prize-fight on his premises, on the ground that such a use of his property will constitute a public nuisance, though it can not grant an injunction against the principals in the contemplated prize-fight, nor those connected with them as managers, trainers, &c., because the process of the criminal courts is adequate to prevent the fight by the arrest and prosecution of the parties concerned.

C. J. PRATT, ATTORNEY GENERAL, BENNETT H. YOUNG, H. L. STONE, D. W. FAIRLEIGH AND HELM BRUCE, FOR APPELLANT.

## STATEMENT.

The judgment appealed from was rendered in a suit brought by the Commonwealth of Kentucky on relation of the Attorney General against Terry McGovern and others to restrain the holding—pulling off—of a prize-fight in the city of Louisville. The principals, and their managers, and the owner of the play house

Commonwealth v. McGovern, &c.

in which it was proposed to hold the fight as a public exhibition of law-breaking, were made parties defendant to the suit.

Terry McGovern and Young Corbett were to be the fighters, and at the time the suit was filed they were in training at Cincinnati, Ohio. This was a precautionary measure, for it was feared that if they should spend several weeks in Kentucky just before the fight was to be pulled off, in preparatory training, they might be disturbed in some way, for what they were preparing to do was publicly and for a large reward, to break the laws of Kentucky. Wherefore it was thought to be wiser to put their feet upon the soil of the State they intended to disgrace the shortest possible time before the actual commission of the crime.

Terry McGovern and Young Corbett are professional prize-fighters. Robert Gray is a promoter of prize-fights in Louisville. and he is a resident of that city. To propagate and encourage the delusion that the bouts which occur are not prize-fights but. exhibitions of the manly art of boxing he does not use his own name in any of the transactions connected with these affairs which come under the notice of the general public. And so it is that these bouts are given under the *auspices* of the "Southern Athletic Club." Robert Gray is the Southern Athletic Club. There is no one else connected with it. He is the whole of it. That is his trade name. This business is one of his trades. Wm. F. Norton owns and operates a large theater, the largest in the city,. known as the Auditorium. The fight was to be given at that. place. It was not to be the first fight held there. It was to be the fourteenth in the series since the 1st day of December, 1900, under the auspices of the Southern Athletic Club.

The proposed fight was widely advertised. Spectators from. almost every State in the Union were expected to be present. The fight, as the ticket stated, was for the feather-weight championship of the world. It was to be a great attraction. The price of the seats near the stage was $20 each, further away $15 each, and remote seats $10 each, and the remotest $5 each. Gallery seats were $3 each. The attendance was expected to be not less than four thousand. Thus a large sum of money for seats alone was to be received by the Southern Athletic Club—Robert Gray—and the Auditorium—Wm. F. Norton. The fighters. were to receive ten thousand dollars between them.

It was common knowledge that the mayor of the city regarded the proposed fight as an encourageable public exhibition, and that no sort of effort would be made by the city authorities to prevent it. The amended petition alleges this; and the evidence, affidavit of W. R. Belknap (read as a deposition), proves it.

In this situation the Governor of the State was appealed to and.

he addressed a letter to the Attorney General, in effect directing him to take such necessary steps as were warranted by law.

The Attorney General, upon a careful consideration of all the conditions, filed this suit in equity in the Jefferson Circuit Court seeking an injunction restraining the holding of the fight.

A preliminary injunction was granted by Judge Field after a full argument. Numerous depositions and affidavits were read upon the hearing of the motion for a preliminary injunction. The moment the preliminary injunction was granted, notice was given that on the next day an application would be made before Judge Guffy to dissolve it. Accordingly, the next day the application was made, the original record being brought up by the circuit clerk because there was not time to make a transcript. Judge Guffy transferred the motion to Judge White, and the whole court sat upon the hearing. After a lengthy argument, Judge White delivered the following written announcement:

"This motion was made before the chief justice, who, by consent of the applicants, transferred the hearing of the motion to Judge White, who invited the whole court, except Judge Paynter (absent), to hear the application with him. The majority of the court who heard the application to dissolve the injunction of Judge Field are of the opinion that the contest which has been enjoined is a prize-fight, and that it is not material whether the victor in the contest is to receive more of the reward offered than the vanquished.

"The court is divided equally upon the question of whether the chancellor has preventive power under the Kentucky Statutes to restrain the holding of such a contest, Chief Justice Guffy and Judges White and Burnam holding the negative, and Judges DuRelle, Hobson and O'Rear holding the affirmative. The motion to dissolve is therefore denied."

Because of this preliminary injunction the fight was not held as planned. The fighters departed from Cincinnati. Their backers and the attending rooters left Louisville. The Southern Athletic Club and the Auditorium remained. The injunction stood as a menace to their business. The single fight had been prevented, a single one in a continuous series of fourteen. The future business must be looked after. They are not interested academically in the settlement of a disputed law point. Questions of law practice have no concern for them. What they are concerned about is the future of the business. It is a fabulously lucrative one. Four thousand seats at from $20 to $5 a seat for a single evening is an attractive proposition. It is of the last importance to lay the chancellor out of sight for the future. The case, therefore, was promptly pressed to a final hearing. It was

assigned to Judge Toney, and he rendered the final judgment. The petition was dismissed absolutely, and the Commonwealth prosecutes this appeal.

The record before Judge Toney was precisely the same as that before Judge Field and before Judge White and his associates, for it was agreed that the affidavits read on the hearing of the motion for a preliminary injunction should be read as depositions on the final hearing.

## THE STATUTE.

1. There is a statute in Kentucky prohibiting prize-fighting and providing that it is felony to engage in a prize-fight, a high misdemeanor, subjecting the offender to fine and imprisonment, to aid or abet in bringing on a prize-fight, a misdemeanor to bet on or voluntarily witness a prize-fight, and a misdemeanor for any one to permit the use of his lands for a prize-fight. In addition, all judges of courts and other named officers are expressly charged to exercise all their powers for the prevention of the crime.

The statute is as follows:

"Section 1284. If any person shall engage in a prize-fight, or a fight for a bet, wager or stakes, by whatever name it may be called, he shall be fined one thousand dollars and imprisoned in the county jail six months.

"Section 1285. If any person or persons shall be a second or seconds in such a fight, or bear a challenge, or the acceptance of a challenge, either verbal or written, for such fight, or make up or aid in making up, the stakes for such fight, or shall, in any capacity, or in any way, aid or assist in bringing on or conducting such fight, he or they shall be fined five hundred dollars and imprisoned in the county jail three months.

"Section 1286. If any person shall bet, or lay any wager on any such fight, in or out of this State, or be present at any such fight in this State, as a voluntary spectator thereof, he shall be fined one hundred dollars.

"Section 1287. If any person owning or occupying or having control of land, shall voluntarily permit the use of the same for any such fight, he shall be fined five hundred dollars and imprisoned in the county jail three months.

"Section 1288. If any person shall train or prepare, or assist another in training or preparing for such a fight in this or any other State, he shall be fined five hundred dollars, and imprisoned in the county jail three months.

"Section 1289. It shall be the duty of *all judges of courts,* justices of the peace, mayors of cities, trustees of towns, and

other conservators of the peace, all sheriffs, constables, marshals, and other police officers, on being informed, or having reason of their own knowledge to believe, that such a fight is about to take place, or that there is training or preparation in any place within their jurisdiction for such fight, to suppress and prevent the same; and for this purpose they shall arrest the offending parties, or have them arrested, or hold them to security for their good behavior, and also commit them to prison, if they do not give bail for their appearance at the next circuit court to answer the charge; *and in order to suppress and prevent the same they shall exercise all the powers vested in them for the prevention of crimes and misdemeanors;* and any officer having such knowledge or information, who shall willfully neglect or fail to execute the duties required of him in this section, shall be fined the sum of five hundred dollars, and shall forfeit his office."

### ARGUMENT AND AUTHORITIES.

The contest was to be a prize-fight. It is argued that the particular *exhibition* which was proposed to be given was not to be a *prize-fight* within the meaning of the statute; and this is contended upon two grounds, viz.: (a) That it was merely a "boxing match" for "points," and was not, therefore, to be a fight; (b) that the reward was to be equally divided between the combatants, and therefore there was no *prize* to be fought for.

A. The Supreme Court of Ohio, in the case of Seville v. State, 49 Ohio State, 117; 30 N. E. R., 624, used what seems to us very sensible language in stating the question to be determined in such a case. It said:

"The question for the jury to decide was whether this combat was a prize-fight, not what the Queensbury rules or any other rules call it, nor what name those accustomed to such combats have given it. What was it in plain language? And this question of fact, under a proper instruction from the court as to what constitutes a prize-fight, the jury was as competent to decide as the most experienced boxer or prize-fighter. The question was not one of skill or science, to be decided upon the opinions of those experienced in such practices, or by rules adopted for the government of associations of such persons; but one within the comprehension of the common understanding and the range of common knowledge."

B. But it is said this is not to be a prize-fight, because the reward was to be *equally divided* between the combatants. The amount to be received by them was $10,000, and it is claimed that this sum was to be equally divided between them. What possible difference would that fact make, if it were a fact? To

say that the statute covers only the case where the reward is unequally divided would be to say that the statute does not prohibit the brutal and debauching public exhibition, but does prohibit a greater reward, being given to one than to the other combatant; that the act was passed to prevent *discrimination* between the victor and the victim; that it was passed out of tender regard for the vanquished in order to see that he should not lose both the fight and the money.

1. Remedy by Injunction.  Neither much debate nor much research is necessary in order to reach the conclusion that, aside from statutory law, the chancellor has no power by injunction to prevent the commission of a crime *as crime*.  That is to say, he may not, because a given act is criminal, *therefore* enjoin the doing of it.  This is the rule, according to the common understanding of the bench and bar.  But, upon the other hand, the power of the chancellor to enjoin the commission of a given act is in no way diminished by the fact that the commission of the act is criminal.  No paralysis of the chancellor's arm is produced by that fact.

Undoubtedly the chancellor has in general the power to restrain public nuisances at the suit of the Attorney General.  This is an ancient power of the chancellor and seems to be traceable as far back as the reign of Queen Elizabeth.  Speaking of this jurisdiction, Judge Story says:

"In regard to public nuisances the jurisdiction of courts of equity seems to be of a very ancient date; and has been distinctly traced back to the reign of Queen Elizabeth.  The jurisdiction is applicable, not only to public nuisances, strictly so-called, but also to purprestures upon public rights and property."  (2 Story's Equity, sec. 921.)

It is well here to note that Judge Story relates the jurisdiction primarily to public nuisances, strictly so-called, where public property rights are not involved.

Now the statute against prize-fighting was enacted to prevent and suppress a great public nuisance—a brutalizing and debauching public exhibition.  That such an exhibition is a *public nuisance* ought not to be doubted by any one.

In Wood on Nuisances, 3d edition, section 68, the author says:

"A public exhibition of any kind that tends to the corruption of morals, to a disturbance of the peace, or of the general good order and welfare of society is a public nuisance.  Under this head are included all puppet-shows, legerdemain, and obscene pictures, and all exhibitions, the natural tendency of which is to pander to vicious tastes, and to draw together the vicious and dissolute members of society."

That a prize-fight is an exhibition of the character here describ-ed, and, therefore, a public nuisance, is the consensus of opinion of the civilization of the twentieth century, as shown in many judicial opinions and the legislative enactments of nearly all the States of the Union. And the courts, some of whose language we have quoted, but here repeat, have been uniform in explain-ing the purpose and motive of such statutes.

Thus, in Sullivan v. State of Mississippi, 67 Miss., 352, the Supreme Court of Mississippi said of the statute in that State:

"We think, however, that the evil sought to be protected against by the statute is the debasing and brutalizing practice of fighting in public places, or places to which the public, or some part of it, is admitted as spectators."

So in State v. Purtell, 56 Kan., 482, the Supreme Court of Kansas, in speaking of the statute of that State, said:

"The evil designed to be remedied by the statute is that class of brutal exhibitions for giving which considerable sums of money were paid, and we do not think the statute can be evaded by rewarding the unsuccessful as well as the successful combatant."

2. But, wholly aside from the broad provision of the statute, we submit that a court of chancery has ample power to prevent by injunction, at the suit of the State, a debauching exhibition of this character, which is essentially and in every aspect a public nuisance. The ground of the jurisdiction is that the chancellor has power by injunction to prevent a *public nuisance*. This power is supported by abundant and conclusive authority.

3. Having argued the power of the chancellor under the stat-ute, and his power aside from the statute, we wish now briefly to submit that a conjoint consideration of the statute and of the general powers of the chancellor leaves no possible doubt of the power of the chancellor to issue the injunction, and of his ab-solute duty to do so upon proper information.

After providing in section 1284 that the principals in a prize-fight shall be deemed guilty of a felony and be confined in the penitentiary, and after providing in section 1285 that the seconds and all those who assist in getting up the fight or conducting it shall be fined and imprisoned, and after providing in section 1286 that any person who shall be a voluntary spectator of such a fight shall be fined the sum of $100; and after providing in sec-tion 1287 that if any person owning or controlling land shall voluntarily permit it to be used for such a fight he shall be fined $500 and imprisoned in the county jail three months; and after providing in section 1281 that any person who shall assist another in preparing for such a fight shall be fined $500 and imprisoned

in jail three months, section 1289 of the Kentucky Statutes then provides as follows:

"1289.' *Duty of officers to prevent.* It shall be the duty of *all judges of courts,* justices of the peace, mayors of cities, trustees of towns, and conservators of the peace, all sheriffs, constables, marshals and other police officers, on being informed, or having reason of their own knowledge to believe that such a fight is about to take place, or that there is training or preparation in any place within their jurisdiction for such fight, to *suppress and prevent* the same; and for this purpose they shall arrest the offending parties, or have them arrested, or hold them to security for their good behavior, and also commit them to prison if they do not give bail for their appearance at the next circuit court to answer the charges; and *in order to suppress and prevent* the same they shall *exercise all the powers vested in them for the prevention of crimes and misdemeanors;* and any officer having such knowledge or information, who shall wilfully neglect or fail to execute the duty required of him in this section, shall be fined the sum of $500, and shall forfeit his office."

It is argued by counsel for the appellees that this section of the statute absolutely takes away from the chancellor any power which he otherwise would have had to enjoin a public nuisance, because, say counsel, prize-fighting is here made a felony by this statute which at the same time provides a remedy for its suppression, to-wit, to arrest the offender and require him either to give bond or go to jail; and they argue that where a statute creates a new offense and provides a remedy for its punishment this remedy is exclusive.

Without entering upon any discussion as to the principle of statutory construction which counsel seek to invoke, where a statute creates a new offense or a new right and provides a method for its vindication, it is an all-sufficient answer to the contention here made by counsel to say that they read *only part* of this section, or rather refer to *only part* of the section, and treat it as if it contained no language except that which directs the arrest of the offender and his imprisonment in case of failure to give bail. When the whole section is read it will be seen that so far from confining the remedy to the arrest and imprisonment of the offender, as the means of preventing the perpetration of the act, it, on the contrary, goes *beyond* this and in most emphatic terms commands every officer of the law to exercise *all the powers* he has to suppress and prevent the offense.

Let us analyze the section. Your honors will observe that in the first clause of the section, reading down to the first semi-

colon, is a general mandate that it shall be the duty of *all judges of courts*, justices of the peace, etc., on being informed or having reason to believe that such a fight is about to take place, "to suppress and prevent the same." Thus far we have simply a declaration as to the duty of these various officers of the law. Then, in the next clause of the section, reading from the first semi-colon down to the second semi-colon, is the provision that for this purpose, to-wit, the purpose to suppress and prevent the fight, they shall arrest the offending parties and require them to give security for good behavior or commit them to prison. *Now counsel for defendants seem to treat this section as if it stopped here.* They treat the section as if it simply declared that it should be the duty of all the officers mentioned to suppress and prevent the fight, and as if it then simply directed them, as a means of suppression or prevention, to arrest the offenders and require them to give security for good behavior or go to jail. They treat the section as if that were all there is in it. But, fortunately for the law, and unfortunately for the law-breakers, the section, after specifically directing that the officers of the law, for the purpose of preventing the fight, shall arrest the offenders and require them to give security or go to jail, *then proceeds further* and adds this significant provision: "*And in order to suppress and prevent the same* they shall exercise *all the powers vested in them* for the prevention of crimes and misdemeanors."

In conclusion, we submit that *a prize-fight is a public nuisance;* that the *jurisdiction and power* of the chancellor to *enjoin a public nuisance,* when the exigencies of the case call for it, is a principle which has been settled for centuries and has been recognized and acted upon many times in late years; that in the particular class of cases now involved, to-wit, prize-fights, the *propriety of enjoining them has been asserted,* and they have been enjoined on four different occasions in as many different States, exclusive of the case at bar; that they have been enjoined in Indiana and Louisiana where the actions of the lower courts have been approved by the supreme courts of those two States; that they have been enjoined in Ohio and Arkansas by chancellors. In addition to these we are glad to add that the same remedy has been granted in this case by Judge Field of the Jefferson Circuit Court, and this action has been approved by at least three of the judges of this court. And on the other side of the matter we can say that no chancellor, except Judge Toney, has ever refused to grant such relief in such a case. And we find a statute in Kentucky which in peremptory terms commands every judge in the State, including in that designation every chancellor in

Commonwealth v. McGovern, &c.

the State, to *exercise every power he has* to suppress and prevent this particular offense of prize-fighting.

We respectfully ask that the judgment of the court below be reversed.

### AUTHORITIES.

1. A prize-fight was contemplated. Ky. Stats., secs. 1284-1289; Seville v. State, 49 Ohio St., 117; 30 N. E. R., 624; Sullivan v. State, 67 Miss., 352; 7 Sou. R., 275; State v. Purtell, 56 Kan., 482; 43 Pac. R., 782; State v. Olympic Club, 47 La. Ann., 1093; 17 Sou. R., 600, 599.

2. Remedy by injunction. 2 Story's Equity, sec. 921; Wood on Nuisances, 3d ed., sec. 68; Ohio, ex rel., v. Hobart, Mss. Op. by Judge Hollister of Cincinnati; Cincinnati R. R. v. Commonwealth, 80 Ky., 139; Muggler v. Kansas, 123 U. S., 672; Attorney General v. Jamaica Pond Co., 133 Mass., 361; In re Debs, 158 U. S., 592; Columbian Athletic Club v. State, 143 Ind., 98; 40 N. E. R., 917; State v. Olympic Club, 47 La. Ann., 1095; 17 Sou. R., 600.

3. Neal v. Palmer, 103 Ky., 496; O'Leary v. State, 58 N. E. R. (Ind.), 703; State v. Patterson, 37 S. W. R., 478; People v. District Court, 46 L. R. A. (Col.), 850; Ex parte Sawyer, 124 U. S., 200; Fletcher v. Tuttle, 151 Ill., 41; 25 L. R. A., 143.

KOHN, BAIRD & SPINDLE, DODD & DODD AND O'NEAL & O'NEAL, FOR DEFENDANTS.

(No brief in the record for defendants, but in lieu thereof the reporter inserts the syllabus of the opinion of Judge Sterling B. Toney.)

1. A preliminary injunction is an interlocutory order, and possesses no element of finality; nor does it anticipate the final determination of the case, nor in any wise conclude the rights of the parties. It simply preserves the subject-matter and the rights of the parties in *statu quo*, until the final hearing, or until the further order of the court.

2. A court of chancery is not a court of criminal equity to purge the Commonwealth of immorality, nor to prevent the commission of crime. In the absence of a statute conferring such power, a chancellor has no jurisdiction to enjoin merely criminal or immoral acts which do not affect rights to property, or other civil or legal rights.

3. The origin, nature and jurisdiction of the common-law and equity courts of England examined and reviewed, and the distinction between the jurisdiction of the common-law courts and the equity courts pointed out: English chancellors and English courts of equity had no jurisdiction to en-

join the commission of crime, nor acts which constituted a public nuisance, unless such acts or offense involved the invasion of the rights of property, either public or private. The remedy of the Crown was by information, or indictment; the remedy of the Commonwealth is by arrest, bail and indictment.

4. Where a statute makes an act a public offense, which was not such at common law, and the same statute prescribes the mode of procedure for the prevention of its commission and the punishment thereof, only the statutory mode of procedure is permissible to prevent or punish its commission, all other modes being excluded by implication.

5. Where no property rights are involved, neither an English chancellor, nor a judge in this State sitting as a chancellor in a court of equity, has jurisdiction on bill filed by the Attorney General on behalf of the Commonwealth, or by a private suitor to enjoin the commission of any act or acts which violate the penal statutes of Kentucky.

6. Section 1289 of the Kentucky Statutes, against prize-fighting, which declares, among other things, that "all judges of courts in this Commonwealth shall exercise all the powers vested in them for the prevention of crimes and misdemeanors" to prevent a prize-fight, confers no jurisdiction or power upon said judges sitting as chancellors in courts of equity to enjoin the commission of a prize-fight; said statute confers no additional power or jurisdiction upon said judges other than such as are possessed by English chancellors: It does not authorize or empower said judges to restrain by injunction the commission of any offense against the penal laws that a common-law court of criminal jurisdiction and a jury can redress.

7. Section 1289 of the Kentucky Statutes is simply a declaratory mandatory statute requiring said judges, as conservators of the peace, to exercise all the powers vested in them by law for the prevention of crimes and misdemeanors in order to suppress and prevent the commission of the statutory offense of prize-fighting. It does not comport with the dignity of the Commonwealth to allege in a bill in equity filed by her Attorney General for an injunction to restrain the violation of the penal laws that she has no adequate remedy to prevent the same.

8. When the Commonwealth of Kentucky appears before one of her own judicial tribunals as plaintiff, she appears not in her sovereign capacity, but as any other litigant or suitor, and can invoke only such powers and jurisdiction as she has by her Constitution and laws conferred upon the court before which she has instituted her action: She can not demand that the

writ of injunction at her instance shall be made to usurp and take the place of the orderly processes of the criminal law which her Constitution and her Legislature have provided for the prevention and punishment of acts in violation of her penal laws.

OPINION OF THE COURT BY JUDGE SETTLE—REVERSING.

This equitable action was instituted in the Jefferson circuit court, common pleas division, by the appellant, the Commonwealth of Kentucky, on relation of the Attorney General, against the appellees, Terry McGovern and others, to prevent the holding of a prize fight advertised to take place on the 22d day of September, 1902, in the Auditorium, a large theatre situated in the city of Lousiville. Terry McGovern and Young Corbett were to be the combatants, and their managers and the owner of the Auditorium were made parties to the action.

It is averred in the petition, in substance, that the prize-fight was to be given under the auspices of the Southern Athletic Culb of which the appellee Robert Gray is the sole stockholder and manager; that the Auditorium has a seating capacity of 4,000, and that the prices of tickets for admission into that building to witness the prize-fight vary from $5 to $20 a seat; that the fight was to take place according to the Marquis of Queensbury rules, and the fighters were to receive $10,000 between them. It is further averred that the prize-fight, if allowed to take place, would bring to the city of Louisville a great number of sporting men, disorderly persons, and criminals, and that the persons so drawn to the city would constitute a lawless, turbulent and dangerous assembly of many thousands of people, and would produce breaches of the peace and other violations of the law, which would have a demoralizing effect upon the good order and well-being of the community, and

produce a public nuisance. It is also averred that a criminal prosecution of the principals and others connected with them would not prevent the great injury that would be done to the people of the State by holding the prize-fight within its bounds, and, finally, that the Commonwealth has no adequate remedy at law for the injury which would result to the public welfare, if the prize-fight were allowed to be held. Answer was filed by the appellees, traversing the allegations of the petition.

Thereafter, upon the pleadings and proof, in the form of affidavits and depositions, the judge of the court in which the action was then pending issued a temporary injunction as prayed, and upon the day following its issual a motion was made by the appellees before one of the judges of this court to dissolve the same, and that judge and five of his associates, members of this court whom he called in consultation, rendered the following opinion:

"This motion was made before the Chief Justice, who by consent of the applicants transferred the hearing of the motion to Judge White, who invited the whole court, except Judge Paynter (absent) to hear the application with him. The majority of the court who heard the application to dissolve the injunction of Judge Field are of the opinion that the contest which has been enjoined is a prize-fight, and that it is not material whether the victor in the contest is to receive more of the reward offered than the vanquished. The court is divided equally upon the question of whether the chancellor has preventive power under the Kentucky Statutes to restrain the holding of such contest; Chief Justice Guffy and Judges White and Burnam holding in the negative, and Judges DuRelle, Hobson and O'Rear holding the affirmative. The motion to dissolve is therefore denied."

After the foregoing action by this court, the case was submitted upon the pleadings and proof to the judge of the chancery division, No. 2, Jefferson circuit court, for trial, who rendered judgment dismissing the petition. Appellant complains of that judgment, and has brought the case by appeal to this court for review.

No one can doubt that the contest between appellees McGovern and Corbett, if it had taken place as advertised, would have been a fight. Indeed, it is clear from the evidence furnished by the record that they are prize-fighters and that the fight was to be one of unusual endurance and extreme brutality, a very feast of blood, to be enjoyed to the full by the thousands who were expected to witness it. From the mass of testimony in regard to the bloody character of such contests found in the record we have but to mention the following:

Lambertson, the sporting editor of a Cincinnati newspaper, in describing a fight of this kind which he witnessed at the Auditorium, said it appeared to him the men were "hitting each other just as hard as they could."

Harris, the manager of McGovern, in speaking of his manner of fighting, says: "There is 'no make-believe' about it; that, when he goes into a contest of this kind, he 'goes in to win;' that he strikes 'just as hard as he can,' and that this is the way with every such contest, unless it is a 'fake.' "

Gearhart, a professor of boxing in the city of Louisville, testified that he had seen a great many contests under the Marquis of Queensbury rules, and that they are brutal; and, upon being asked if it was customary for the contestants to try to knock each other out in such contests, he said: "The contestants do generally, if they are fighting under the Marquis of Queensbury rules, endeavor to knock each .

other out, because, if they succeed in doing that (that is, in knocking their opponent down, so that he is unable to get on his feet in ten seconds), in that way they will get the decision. Hence, they always endeavor to do that, if they are 'fighting on the square,' in sporting parlance." Upon being further asked if the sports would regard it a square contest if the opponents did not use their best endeavor to knock each other out, he answered: "No, that would be considered a 'fake.'"

A physician, Dr. Gossett, testified to having professionally attended a man named Handler, after his fight with Bill Harrahan at the Auditorium in November, 1901, and of his condition said: "His upper lip was cut in two places— one side clear through to the teeth, completely severed, and the other side was nearly through. His upper lip was swollen about three or four times its normal thickness, and one eye was completely closed and swollen very much. Both lids were swollen about an inch in thickness, due to the extravasation of blood. He could not open one of his eyes. The other was very nearly as bad. He had a cut over one eye, about an inch and a half in length, in which we had to take three or four sutures. We took six or eight sutures in his lip. His face was very much bruised; looked like a piece of raw beef. Blood was oozing from different parts of it. . . . When I first saw him, the feeling I had was of sickening disgust."

Another witness, Mr. Lewis Humphrey, testified that he saw the fight between Ryan and West for the championship of the middle-weights of the United States, which occurred in the Auditorium in the city of Louisville on March 4, 1901. They fought with five-ounce gloves and under the Marquis of Queensbury rules. The fight was under the auspices of the Southern Athletic Club, of which the appellee

Commonwealth v. McGovern, &c.

Robert C. Gray was then, as now, the manager, and some of the city police were present. The fight is thus graphically described by the witness: "I saw this fight from beginning to end, being very close up to the ring, where I could very distinctly see both contestants during the whole fight. They were dressed in the manner which is universally customary with prize-fighters, being stripped to the waist. They started into the fight in the usual manner, by shaking hands in the center of the ring, and then began to fight each other with their fists, using and manifestly exerting all of their physical strength in the blows delivered against each other. It was an extremely vicious fight, and the physical punishment of each of the contestants was very great. West was the greatest sufferer. His nose was split early in the fight, so it hung in two portions. Midway in the contest he was so covered with blood that above the waist it was difficult to see the white skin. The gloves on the hands of his opponent, Ryan, became fairly soggy with blood from striking the face of West. West showed the greatest endurance, and, although at least half a dozen times it appeared as if he would faint, he remained in the ring until the close of the seventeenth round. During this time, he was several times knocked to the floor, and barely managed to rise before the count of ten. At the end of the seventeenth round, he took a seat in the corner, and was in such a dazed and weakened condition, that, after consultation with his seconds, the referee declared him unable to go further, and awarded the fight to Ryan. During the fight Ryan resorted to what is known as 'chopping tactics,' and cut and bruised West in innumerable places about the entire face and head; also striking him in the body, raising very perceptible bruises. Ryan was himself badly cut about the face, and one of his eyebrows split. He bled very

freely, and the attention of his seconds between the rounds was almost entirely taken up with removing the blood from his face and body. A large quantity of blood covered the floor on which they were fighting, making it at several places very slippery."

The combats described by the witnesses were conducted according to the Marquis of Queensbury rules. It is admitted that the prize-fight, to prevent which the injunction in this case was sought, was to be fought under the same rules. A copy of these rules is made a part of the record in this case, and we here quote from that copy the following:

"Sixth. When the contestant has fallen to the ring floor through the medium of a blow or weakness, he must arise, unassisted, within a period of ten seconds. His opponent must meanwhile retire to his corner, and not resume fighting until the fallen man has regained his feet. Should the latter fail to recommence the battle within the specified ten seconds, the referee shall award the victory to the other contestant. When a contestant is on the floor, the count shall be made by the official timer of the club, either from an electric clock or his watch. He shall call off each second by striking the gong.

"Seventh. A contestant, on one knee, or hanging on the ropes in a helpless condition with his toes off the floor, shall be considered down, and, if struck while in that position, must be awarded the decision by the referee."

The brutal frankness of the language contained in these rules manifests, without the aid of extrinsic evidence, the character of the fighting provided for therein, and the cruelty of the punishment that may be inflicted thereunder.

The fact that the reward in this case was to be equally divided between the combatants can not legalize the trans-

action.  As well said by counsel for appellant, to hold that
the statute against prize-fighting covers only the case where
the reward is unequally divided would be to say that the
statute does not prohibit the brutal and debauching public
exhibition, but does prohibit a greater reward being given
to one than to the other combatant.  It would be absurd
to place such a construction upon the purpose and object
of the statute, and certainly there is nothing in its lan-
guage that warrants the conclusion that it was enacted
to prevent discrimination between the victor and the van-
quished.  "The evil designed to be remedied by the statute
is that class of brutal exhibitions, for giving which con-
siderable sums of money were paid, and we do not think
the statute can be evaded by rewarding the unsuccessful,
as well as the successful party."  State v. Purtell, 56 Kan.,
483, 43 Pac., 783.

Nor will the use of gloves by the combatants in a prize-
fight make such a combat any less an offense in the eyes
of the law.  The Supreme Court of Louisiana in the case
of State v. Olympic Club, 47 La. Ann., 1095, 17 South., 599,
said of such a contest as the one under consideration:  "The
glove contests permitted in defendant's club are advertised
extensively and are generally known as 'prize-fights.'  The
fighters are under contract with each other, with the club,
and under obligations to spectators and betters, to fight
to a finish; that is, usually until there is what is called a
'knock-out.'  There can be no reasonable objection to boxing
as generally understood.  It is a manly, healthful, and vig-
orous training, and encouraged in some of our most respect-
able institutions; and interference with it by legislative
power would be a great stretch of authority, bordering up-
on an infringement of personal liberty.  And even boxing
without gloves for a display of skill and for pastime, when
there is no breach of the peace, and no intentional injury to

the person, can not be considered as embraced within the statute. But in a prize contest for a purse, with or without gloves, there is, despite the customary shaking of the hands and the 'preliminary courtesies between the combatants, an intention to do injury and to break the public peace. The contest is directly within the spirit, if not the exact definition, of an assault. In such a contest, there can be no absence of an intention to do an injury, for the purpose of the contest is to subdue an opponent by knocking him senseless, or so injuring him that he can not, within a given time, continue to fight."

It now remains to be seen whether a court of equity has jurisdiction to prevent by injunction a prize-fight. Kentucky Statutes (1899), sections 1284-1288, inclusive, prohibit prize-fighting, make it a felony to engage in prize-fighting, a misdemeanor to aid or abet in bringing on a prize-fight, or to bet on or voluntarily witness such a fight, and also a misdemeanor for any one to permit the use of his lands for a prize-fight.

Section 1289 provides: "It shall be the duty of all judges of courts, justices of the peace, mayors of cities, trustees of towns, and other conservators of the peace, all sheriffs, constables, marshals, and other public officers, on being informed or having reason of their own knowledge to believe that such a fight is about to take place, or that there is training or preparation in any place, within their jurisdiction, for such fight, to suppress and prevent the same, and for this purpose they shall arrest the offending parties, or have them arrested, or hold them to security for their good behavior, and also commit them to prison, if they do not give bail for their appearance at the next circuit court to answer the charge; and in order to suppress and prevent the same, they shall exercise all the powers vested in them for the prevention of crimes and misdemeanors; and any

officer having such knowledge or information, who shall willfully neglect or fail to execute the duties required of him in this section, shall be fined in the sum of $500.00, and shall forfeit his office."

We are told by Judge Story, in his excellent work on Equity Jurisprudence (volume 2, section 921): "In regard to public nuisances, the jurisdiction of courts of equity seems to be of very ancient date, and has been distinctly traced back to the reign of Queen Elizabeth. This jurisdiction is applicable, not only to public nuisances, strictly so called, but also purprestures upon public rights and property." Again, in section 924, it is said by the same author: "The ground of this jurisdiction of courts of equity in cases of purpresture, as well as of public nuisances, undoubtedly is their ability to give a more complete and perfect remedy than is attainable at law, in order to prevent irreparable mischief, and also to suppress oppressive and vexatious litigation." Continuing the discussion, the learned writer announces further that: "The courts (of equity) can not only prevent nuisances that are threatened, and before irreparable mischief ensues, but arrest and abate those in progress, and by perpetual injunction protect the public against them in the future, whereas courts of law can only reach existing nuisances, leaving future acts to be the subject of new prosecutions or proceedings. This is a salutary jurisdiction, especially where a nuisance affects the health, morals, or safety of the community. Though not frequently exercised, the power undoubtedly exists in courts of equity thus to protect the public against injury."

In Pomeroy's Equity, 3d vol., section 1349, it is said: "A court of equity has jurisdiction to restrain existing or threatened nuisances by injunction at the suit of the Attorney General in England, and at the suit of the State or

the people, or municipality, or some proper officer repre-senting the Commonwealth, in this country."

In 21 Am. & Eng. Ency. of Law, 703, it is likewise said: "A court of equity has discretionary jurisdiction to enjoin the creation or erection of either a public or private nui-sance or a purpresture. This jurisdiction is founded upon the ability of equity to prevent irreparable mischief and vexatious litigation and to furnish a more complete remedy than can be had at law. The remedy by indictment for a public nuisance is not an adequate remedy at law, preclud-ing the remedy by injunction; nor is the right of a private person to call upon the public authority to abate the public nuisance, after its erection, such a remedy."

In Attorney General v. Jamaica Pond Aqueduct Corp., 133 Mass., 361, an injunction was granted, to restrain the lowering of the waters of a pond, on the ground that it would be injurious to the public health. In concluding its opinion, the court said: "Indeed, it may be affirmed that in no well-considered case has the power of a court of equity to interfere by injunction in cases of public nuisances been denied; the only denial being that of a necessity for exer-cise of that jurisdiction under the circumstances of the par-.ticular case."

In Mugler v. Kansas, 123 U. S., 672, 8 Sup. Ct., 273, 31 L. Ed., 205, suit was brought by the State to enjoin the operation of a distillery, which was forbidden by its laws, on the ground that it was a public nuisance, injurious to the morals of the community. The court, after referring to the rule herein quoted from Story's Equity, adopted it without reservation. The same doctrine is adhered to in People v. City of St. Louis, 48 Am. Dec., 339, and Attor-ney General v. Railroad Cos., 35 Wis., 425.

We find by the foregoing authorities that the jurisdiction

Commonwealth v. McGovern, &c.

of courts of equity to prevent and suppress nuisances, especially such as affect the public health, morals or safety, is of ancient date, though in Kentucky this power has been somewhat restricted in its application. While the writ of injunction may not be employed to prevent the commission of crime, as such, we see no reason why it may .not be resorted to to prevent the use of real property for the holding of a prize-fight. Indeed, we think the use of the injunction for this purpose is not only permissible, but required by the statute, supra, enacted to suppress that evil, if the means at the command of the criminal courts are inadequate to its suppression.

We are not inclined to believe that the language of the act, supra, "shall exercise all the powers vested in them for the prevention of crimes and misdemeanors," confers upon any of the officers named therein new powers of any kind; but it does require of all ministerial officers of the State peculiar and extraordinary alertness, activity, and zeal in the exercise of all the powers with which they are vested in the matter of preventing and suppressing prize-fights, and any willful failure of duty on their part will subject them to a fine of $500 and the forfeiture of office. The same provision of the statute requires that "all judges of courts," in the performance of the duties enumerated in the statute, "in order to suppress and prevent" prize-fights, shall exercise all the powers vested in them for the prevention of crimes and misdemeanors. It will be observed that the language, supra, not only embraces judges of courts of purely criminal jurisdiction, but also includes all judges of courts. Therefore, the command reaches judges of common-law and equity jurisdiction, and no such express command is laid by the Kentucky Statutes upon all judges with reference to any other crime or misdemeanor

than prize-fighting. Under the statute, then, it is the duty
of all the officers, both judicial and ministerial, named
therein, to act without delay in preventing and suppressing
prize-fights. They are not to wait for the fight to begin,
nor for the principals and others who are to engage therein
to reach the place determined upon for the fight, before
taking the necessary steps to prevent the same, but should
proceed at once before the fight, and, upon receiving notice
of the fact that it will be held, to issue proper process
for the arrest of the guilty parties, put them under arrest,
and require of them bonds to keep the peace, and to answer
for the violation of law in the circuit court.

The question presented for the consideration of the judge
of the Jefferson circuit court, when the injunction was ap-
plied for in this case, was whether or not the powers that
might be invoked under the criminal jurisdiction of the
courts were adequate to the suppression of the prize-fight
about to come off, and, if not, what further powers might
be exercised by him? As the statute required of him the
exercise of all the powers of which he was possessed, and
the right to employ the writ of injunction being one of
those powers, it was his duty to grant it to the extent
of preventing the use of the Auditorium for the holding of
the prize-fight, if in the exercise of a sound discretion the
facts before him justified such relief, in aid of the jurisdic-
tion of the criminal courts. In granting the injunction to
the extent indicated, the chancellor only exercised the juris-
diction that was exercised in draining the pond, and in sup-
pressing the distillery, in the Massachusetts and Kansas
cases, supra.

In none of the cases, supra, was there any question of
property or pecuniary right involved; nor need there be
any property right involved, so far as the State is concerned,
in the maintenance of the public health, morals, or safety.

These are all valuable rights, though not susceptible of a pecuniary estimate, which it is the duty of the State to protect by every means at his command; and, if a court of equity has the power to enjoin the use of private property as a nuisance which is dangerous to the public health, why may it not in like manner enjoin it where it constitutes a nuisance dangerous to the public safety or morals?

Is the use of land or a building for the maintenance of prize-fighting a public nuisance? In Wood on Nuisances (3d Ed.) section 68, the author says: "A public exhibition of any kind that tends to the corruption of morals, or to a disturbance of the peace or of the general good order or welfare of society, is a public nuisance. Under this head are included all puppet shows, legerdemain, and obscene pictures, and all exhibitions, the natural tendency of which is to pander to vicious tastes, and to draw together the vicious and dissolute members of society." That a prize-fight is an exhibition of the character here described, and consequently a public nuisance, there can be no doubt; and, if so, the use of a theater for prize-fighting is such a nuisance. Therefore the Legislatures of many of the States have enacted laws for their suppression, realizing, no doubt, that the remedies afforded by the general laws were not adequate to that end; and the courts have been uniform in upholding the statutes thus enacted. Thus, in Sullivan v. State, 67 Miss., 352, 7 South, 276, the Supreme Court of Mississippi said: "We think, however, that the evil sought to be protected against by the statute is the debasing practice of fighting in public places, or places to which the public, or some part of it, is admitted as spectators."

Such a meeting as would have been held in the Auditorium, in Louisville, to witness the prize-fight between

McGovern and Corbett, if that fight had occurred, would
doubtless have attracted some of the better and law-abiding
class of citizens, curious to see such a spectacle as a prize-
fight; but for every such reputable citizen thus attending,
there would have been present a dozen gamblers, confidence
men, bunco steerers, or pickpockets, gathered from all parts
of the United States, men of idle, vicious and criminal
habits and practices, whose business is to prey upon the
public in some form or other, and many of them would
remain in the community after the combat to ply their
nefarious callings.    Such an assembly could easily be led
into a riot, or other unlawful disturbance of the public
peace.    In addition to the evils suggested, there would be
the contaminating effect of such a meeting upon the youth
of the city and State, which might prove of incalculable
injury to their morals and future welfare.    Such a gather-
ing, too, would demand increased vigilance in the protec-
tion of the property of the city and its inhabitants, be a
menace to good order, and disturb the peaceful pursuits
and happiness of citizens who would be unwilling to patron-
ize such an enterprize.

We conclude, therefore, that while a court of equity may
not grant an injunction against the principals who were
expected to engage in the fight in question, nor those con-
nected with them as managers, trainers, etc., because the
process of the criminal courts and the powers of con-
servators of the peace in the city of Louisville are, or ought
to be, adequate to the prevention of the prize-fight, by the
arrest and prosecution of the parties concerned, yet it was
proper for the lower court to enjoin the owner, proprietor
and managers of the Auditorium theater from permitting
the holding of a prize-fight therein, and from allowing there-
in any future exhibitions of the same character, upon the
ground that such a use of the building would constitute a

public nuisance, dangerous to the public morals and safety. We think this exercise of power by the court can not be questioned, not because any new powers were conferred upon it by the statute against prize-fighting, but because such jurisdiction exists in courts of equity, and has practically always so existed, and, further, because its exercise was required in this instance by the exigencies of the case and the express language of the statute, which commanded the court to use all the power with which he was vested, to the end that the nuisance might be suppressed.

As already suggested, not the least of the evils connected with the holding of the prize-fight would be the presence of the immense crowds of lawless and turbulent men from all quarters. An injunction against the use of. the building advertised as the place of the fight would go far toward preventing the assembling of this crowd, and thereby avert incalculable mischief, which could not well be averted by the criminal courts, or their ministerial officers, after the meeting of the audience at the place of the combat, or in the act of assembling; for, although every person who attends a prize-fight by that act violates the law, it would be impossible for the officers of the law to arrest any considerable number of them under such circumstances.

We do not regard this case as analogous to that of Neaf v. Palmer, 103 Ky., 496, 20 R., 176, 45 S. W., 506. In the latter case the action was brought by several property owners to enjoin the maintenance of a bawdy house upon the property of another. In passing upon the questions involved, this court said, in part: "It is not alleged that there are offensive sights or sounds about the obnoxious premises, but only that the property is made less valuable in the vicinity, and that the moral atmosphere is tainted and pestilential. The injury is wholly consequential. It seems to us, under these circumstances, criminal courts had

best be left to enforce the criminal laws. They are confessedly adequate for the purpose of suppressing such evils."

There was nothing in the case, supra, to indicate that the bawdy house complained of could not be suppressed by the ordinary methods appertaining to the criminal court, and, the damages resulting to the plaintiff's property from the existence of the bawdy house being wholly consequential and speculative, it would, of course, have been improper in that case to employ the writ of injunction in aid of the mere property rights of the individual. But in the case at bar the complainant is the State—the sovereign—which is seeking by a writ of injunction to prevent a great evil, affecting the people of the city of Louisville, and the entire State as well, and which threatens irreparable injury to the public morals because of its cruelty, inhumanity, and debasing associations, and danger to the public safety because of its bringing together the lawless and turbulent elements of society from all quarters. Upon such a state of facts, and with the commands of the statute directing him to employ all his powers to avert the threatened evil, it was, in our opinion, no stretch of authority for the chancellor to employ the aid of the writ of injunction in such an emergency, to the extent, at least, of preventing the use of real property for the holding of the prize-fight. Nor do we think that the right of the chancellor to so employ the writ of injunction in this case is dependent upon the fact that a property right be involved. It may be justified upon the higher ground that the morals and safety of the public are involved, and that the public good is of the first consideration.

If the element of continuity were needed in this case to authorize the injunction, it is shown by the record to exist; for several witnesses testify to having attended contests similar to this in the Auditorium, and the advertisement

of the McGovern-Corbett fight showed that it would come
off at the Auditorium, and that it was one of a series of
fourteen of such contests, all given under the auspices of
the Southern Athletic Club, and several of which had al-
ready been held, and perhaps some of them elsewhere than
in the Auditorium.  The evidence shows, therefore, that
the use of the Auditorium had, to some extent at least,
been devoted to the maintenance of prize-fights, and that
its use for that purpose is to be continued.  We are of the
opinion, however, that continuity is not a necessary ele-
ment in this case.  In Cincinnati Railroad Co. v. Common-
wealth, 80 Ky., 137, the railroad was indicted for a public
nuisance in leaving a hand-car on a public road; and, though
the proof showed that the car did not remain for more than
a day, this court held that the offense "was not to be de-
termined by the length of time the thing that worketh hurt,
inconvenience or damage to the public continues, or by the
number of times it may be repeated, nor is it necessary, in
order to constitute the offense, that actual injury be sus-
tained by any person."  In order to constitute a public nui-
sance, in the meaning of the law, it is not always necessary
that the acts charged should have been habitual or periodi-
cal.  Where a single act produces a continuing result, the
offense may be complete, without a recurrence of the act.
Thus one act upon the part of an individual in befouling a
spring from which the public are accustomed to drink is
a public nuisance.  So is indecent exposure of one's person
in a public place.  Wood on Nuisances, sections 27, 57.  To
constitute the offense denounced by the statute as a prize-
fight, or prize-fighting, it is not necessary that a number
of such combats or that more than one combat should
take place.  We think one such offense at a given
place would constitute a public nuisance, and, it is,
the province of a court of equity to prevent nuisances that:

are threatened, and before irreparable mischief ensues, as well as to arrest or abate those in progress, and by perpetual injunction protect the public against them in the future.

Being of the opinion that the chancellor erred in dismissing the petition, and in refusing to perpetuate the injunction, in this case, to the extent of restraining the owners and managers of the Auditorium from permitting the use of that building for the holding of the prize-fight between appellees, McGovern and Corbett, the judgment is reversed, and cause remanded, with directions to set aside the order dismissing the petition, and to enter in lieu thereof the necessary decree perpetuating the injunction to the extent herein indicated.

Whole court sitting.

Judges Paynter, Barker and Nunn dissent.