## Commonwealth ex rel. Grauman v. Continental. Co., Inc.

(Decided Nov. 4, 1938.)

LAWRENCE S. GRAUMAN for appellant.

HERMAN COHEN, W. W. DOWNING and SHACKELFORD MILLER, JR. for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Reversing.

The Commonwealth of Kentucky, on relation of Lawrence S. Grauman, County Attorney of Jefferson County, Kentucky, instituted this action in the Jefferson circuit court against the Continental Company, Incorporated, to enjoin it from engaging in the business of making loans to the amount of $300 or less, and charging a rate of interest in excess of 6% without having been granted a license to engage in what is known as the Small Loan Business, pursuant to the Small Loan Law of the State of Kentucky, section 883i-1 to 883i-32, inclusive; and particularly from continuing a business of making such loans in connection with the sale of certain life insurance policies, same being alleged to be a mere scheme or device to evade the law.

The petition alleges in substance, that prior to the enactment of the Small Loan Law at the 1934 session of the General Assembly of Kentucky, as set forth in the sections of the Statutes, supra, agents, officers and employees of the defendant sought to work out some scheme or device under which it could lend money in small amounts in Jefferson county to poor wage earners at excessive and usurious rates of interest and to prevent the recovery of such interest paid by such borrowers and to avoid complying with the provisions of the said Small Loan Law; that the defendant conceived the plan of engaging in the business of lending money in Louisville in small amounts to poor and necessitous wage earners at excessive, exorbitant and usurious rates of interest and to prevent the recovery of such interest paid by the borrowers by having the borrowers at the time loans were made to them, to buy life insurance from or through the defendant company and to obligate themselves to pay a substantial amount as premiums for such insurance which premiums amounted to considerably larger sums than the sums borrowed.

For an accurate and full statement of the basic facts pertinent to the cause of action we here copy the pertinent allegations of the petition:

"That during the latter part of the year 1936, before it was incorporated but while its present offi-

cers were trading under the name of the Continental Company, and up to this time, during the year 1937, the defendant, The Continental Company, at its office in the Starks Building, Louisville, Kentucky, conducted under the name of the Continental Company, now the Continental Company, Incorporated, has made loans to numerous persons in the value of $300.00, or less and in the making of said loans, in furtherance of a subterfuge, plan and scheme to lend money in violation of the provisions of the Small Loan Law referred to above, and in furtherance of a plan to escape the provisions of said Small Loan Law, and to enable the said defendant to lend poor and necessitous wage earners small sums of money at high, excessive, exorbitant, illegal and usurious rates of interest, has as a further consideration for the lending of said money, so as to enable the said defendant to collect in addition to the six per cent (6%) interest which it required the borrowers to agree to pay, require each of said borrowers to take out a life insurance policy for an amount greatly in excess of the amount of money loaned by the defendant and required each of said borrowers to obligate himself to pay a sum of money as a premium for said life insurance policy, which premium in some instances amounted to in excess of the amount of money actually being borrowed, and that the defendant is now engaged in the business of making loans as aforesaid at its said place of business.

"That the real purpose which the defendant has had and which it now has in requiring the borrower to purchase life insurance at the time of the making of the loan to him, was and is not for the purpose of affording the defendant as lender mere security and protection for the amount of the loan, but for the express purpose of enabling the defendant to exact an enormous rate of interest far in excess of 6% on the amount actually advanced.

"That the defendant, The Continental Company, Incorporated, or prior to its incorporation when said business was conducted under the trade name of the Continental Company, is not now nor has it been at any of the times referred to in the petition, licensed or authorized to lend money pur-

suant to the provisions of the Small Loan Act of the State of Kentucky, and has been directly engaged in the business of making loans in the amount or value of $300.00 or less, and charging, pursuant to the device and subterfuge set out above, a greater rate of interest or consideration therefor than 6% per annum.

"That the defendant is now actively advertising that the Continental Company, Incorporated, lends money at the rate of 3% simple interest, and is openly holding itself out to the public as engaged in the business of making loans where the interest is charged at the rate of 3% per year, but that in making the loans hereinabove referred to, the defendant, pursuant to the scheme and device adopted to circumvent the provisions * * * of the Small Loan Law of Kentucky is actually engaged in the business of making loans of less than $300.00, and charging therefor, directly or indirectly, by device, subterfuge and pretense, a rate of interest in excess of 6% per annum.

"The plaintiff files herewith as Exhibits A and B respectively, advertisements published in the daily newspapers of the City of Louisville, during the times herein referred to; that the defendant regularly publishes advertisements similar in form and substance to those filed herewith as exhibits and as a result of said advertisements, it attracts to its said office referred to above, numerous poor, ignorant and illiterate wage earners and induces such persons to borrow money from the Continental Company, Incorporated, and to purchase life insurance in amounts much larger than the amount of money being borrowed, as set out above.

"That the defendant is not now and has not been at any of the times hereinafter mentioned, a life insurance company, issuing policies of life insurance.

"That as heretofore set out, the defendant has for several months last past, continuously made loans in the amount or of the value of $300.00 or less, and by reason of the subterfuge and scheme set out above, charged interest greater than 6% per annum, and that said acts were done and are

242

being done continuously by the defendant wrongfully and in violation of the provisions of the Small Loan Law and without legal right or authority so to do."

It is further alleged that the plaintiff has no adequate remedy at law to prevent the aforesaid various and numerous violations of the statutes by the defendant; that the penalty for said violations of said statute is so small that it would necessitate many and various and a multiplicity of criminal prosecutions to attempt to prosecute the defendant for violations of the Small Loan Law and that such prosecution would not have been adequate to stop the defendant from so doing and therefore plaintiff is without remedy except by injunction. The answer consisted of a denial only.

A number of exhibits referred to in the petition are filed with the record. They consist of newspaper clippings with the word "Loan" in large type. One of the advertisements reads: "Millions to Loan for Working Capital etc. Signed the Continental Company Incorporated R. S. Motte President." This advertisement makes no mention whatever of insurance. A number of other advertisements are of a similar nature except there appears in small type, this sentence: "Let Us Explain Our Plan and Save you Money Confidential Loans Combined With Insurance." A number of advertisements reads, "Loans" * * * $3.00 Interest per year Per $100.00." The reference to insurance in all the advertisements, where it is mentioned at all, is in rather small, inconspicuous type as we have indicated above.

It is apparent from the advertisements that loans was the thing stressed and calculated to attract the attention of the public. The reference to insurance could very easily be overlooked.

The plaintiff took the evidence of R. S. Motte, President of the defendant company, as if on cross-examination. The substance of his testimony is that defendant company was in the insurance business, rather than the loan business. He gave a concrete example of their maneuvers and methods of making loans combined with insurance, in substance, that, when a person called on the defendant company to borrow money he was informed that they would make him no loan unless he took out a policy of insurance for at least $1,000, since the companies will not write a policy for less than

that amount. For a $25 loan the premium on the policy which the borrower was required to take is $25.04, and the borrower actually gets $23.50 in money, but signs a note for $48.84. The note is payable $1 per week over a twelve-month period. The lender, defendant company, gets 70% of the premium, or $17.52. The interest paid in advance is 34c, making a total of $17.86, which the lender actually gets. The above illustration is applicable to a young person, perhaps in his early twenties, but the rate of premium paid for the insurance policy increases according to age. Mr. Motte said that the insurance company had no connection with the defendant company but that he turned over to his company, defendant, all the premiums received by him and the company paid him $60 per week salary. The policy was not assigned to the lender as security for the loan or otherwise, nor is it made payable to the lender. There being no relationship between the amount of the loan and the insurance policy, it is apparent that the only purpose of the policy is to enable the lender to collect its part of the first premium which the borrower is required to pay in order to get his loan. It was virtually admitted by Mr. Motte that the loans made would result in a loss to the business, but for the premium on the insurance policies. Mr. Motte said he devoted all his time and attention as President of the Continental Company, Incorporated, to transacting business which is conducted at the office of the company. He was asked and answered as follows:

"Q. The nature of that business is that it is transacted when people in response to the ads run by the Continental Company, come to the office of the Continental Company to borrow money, you explain to them that they can borrow money from the Continental Company if they combine their loan from the Continental Company with the purchase of life insurance policy from the Oh'o National Life Insurance Company? A. If they qualify * * * and are insurable.

"Q. And if they are insurable and if they qualify under you company's regulations, then at the time the loan is made the amount of the premium on the insurance policy is secured, together with the amount of the loan, and you take a note for the sum total of those two amounts? A. That is right

"Q. Then the corporation,—The Continental Company—sends its check to the Ohio National Life Insurance Company, of Cincinnati, Ohio? A. That is right.

"Q. * * * for their portion of the premium which is figured in the note executed to the Continental Company, which is going to the Ohio National Life Insurance Company under the general agency contract which you have? A. That is correct—that is a good understanding· of it.

"Q. And the balance of the premium charged for the insurance policy is represented in the face amount of the note executed to the Continental Company, and when that note is paid in full that part of the payments made on the note which represents the entire premium due for the life insurance policy which was written is retained by the Continental Company as its property by reason of the fact that in consideration of the payment of the salary of $60.00 a week to you, you have assigned all your interests in the first premium on the policy? A. That is correct."

It is thus seen from the evidence of Mr. Motte that the insurance policies, which the borrower is required to purchase in order to obtain a loan, are not assigned to the company as security for the note representing the loan, or otherwise, and that but for the insurance premiums the business of the defendant company would be operated at a loss. Furthermore, it is at once apparent that the loans and insurance premiums and the scheme and set-up as detailed by Mr. Motte, are so intermingled and combined with each other as to be inseparable. In view of his admission that the loan business would operate at a loss but for the insurance business and that the defendant company receives a large per centum of the insurance premium which is paid to it by Motte and it in return pays him a salary for his services and the defendant company being the beneficiary of a large per centum of the premium supplementing its loan business which otherwise would operate at a loss, it cannot be said, as claimed by Mr. Motte, that his insurance contracts and transactions are independent of the loan business. But on the contrary they are so intermingled as to impress one that the whole scheme and set-up is for the purpose of obtaining a large rate of interest,

approximately 200% on the loans. As we have already noted, the main thing advertised and displayed before the public eye, is "Loans" rather than insurance. It cannot be doubted that the defendant's customers were lured and attracted to its place of business for the primary purpose of securing a loan with no intention or expectation of purchasing an insurance policy, but when they make application for a loan they are then informed that they will not be granted a loan unless they obtain or purchase from Mr. Motte's insurance company an insurance policy and execute their note for the loan and the insurance premium combined.

Section 883i-21 and 883i-24, respectively, of the statutes read as follows:

"Section 883i-21. No person, except as authorized by this Act, shall, directly or indirectly, by any devise, subterfuge, or pretence whatsoever charge, contract for, or receive, or participate, as agent, broker, or in any other capacity, in charging, contracting for, or receiving, any interest, discount, or consideration greater than six per centum (6%) per annum upon any loan in the amount or of the value of three hundred dollars ($300) or less, and no loan made in violation of the provisions of this Act shall be valid or enforceable within this Commonwealth."

"Section 883i-24. The payment of three hundred dollars ($300) or less in money, credit, goods, or things in action, as consideration for any sale, assignment, or order for the payment of wages, salary, commissions, or other compensation for services, whether earned or to be earned, shall be deemed for the purposes of regulation under this Act a loan secured by such assignment, and the amount by which such assigned compensation exceeds the amount of such consideration actually paid shall be deemed for the purposes of regulation under this Act interest or charges upon such loan from the date of such payment to the date such compensation is payable. Such transaction shall be governed by and subject to the provisions of this Act."

It is our view that the evidence in this case brings it within the purview of the statutes, supra, in that, it is

a device, subterfuge, or pretence of Mr. Motte, the President of the defendant company, in combining his agency with the insurance company, with the defendant company for the purpose of obtaining a rate of interest in excess of 6% per annum upon the loans made by defendant company, such loans being $300 or less. It is admitted that defendant company has no license to engage in the small Loan Business, and has not qualified to operate under the Small Loan Law.

The case of Jernigan v. Loid Rainwater Company, Ark., 117 S. W. (2d) 18, is a case where loans and insurance policies were intermingled and combined, and the Arkansas court held it to be a subterfuge to evade the requirements of the Small Loan Statute of that State and the court refused to require the Examining Officer of the Banking Department to issue a license to transact business under the Small Loan Statute of that state. The court said [page 19]:

"The insurance is not written to cover or protect the amount of the loan, or to cover the period of time for which the loan is made, but is merely a requirement made by the loan broker in order that he may receive an amount of money in excess of the ten per cent. interest charged. * * *

"It was not required that any insurance policy be assigned as security for the loan made, and it is obvious that this was not the purpose of taking out the insurance, as the policies bore no just proportion to the sum of money loaned. The examining officer of the banking department was fully justified in concluding that so much of each note as was in excess of the sum loaned was not reasonably required in connection with such transaction, and, if this be true, just reason existed, not only to refuse to issue a license, but to cancel one which had been issued. The inference is fairly deducible that it is not insurance which the borrowers want, but that their need for the small loans made them is such that they accept the loans on any terms that may be imposed. It must be true that many of these borrowers do not want insurance, and are not able to carry it, and they have no intention of doing so beyond the period of time covered by the premium which becomes a part of the notes they signed. This

is not a service reasonably required in connection with the transaction, as it furnishes no security for the service rendered and the loan made. * * *

"It is argued on behalf of appellee that the insurance is worth what it costs, and that no more is charged these borrowers than is charged others who take out similar insurance. This may be true, but the fact cannot be disguised that it is not insurance which the borrower wants. His pressing need is for a small loan, which he accepts upon any terms that may be imposed, and it is no service to the borrower to require him to take something he may not want and can ill afford to have, but which he accepts because his necessity permits no alternative. * * *

"Appellee's honesty is not questioned, nor is his efficiency, but it has been found that his plan of operation is not fair to the hapless borrower with whom he proposes to deal."

Also, in Hurt v. Crystal Ice & Cold Storage Company, 215 Ky. 739, 286 S. W. 1055, involving usury laws, the court said [page 1056]:

"The cupidity of lenders, and the willingness of borrowers to concede whatever may be demanded or to promise whatever may be exacted in order to obtain temporary relief from financial embarrassment, as would naturally be expected, have resulted in a great variety of devices to evade the usury laws; and to frustrate such evasions the courts have been compelled to look beyond the form of a transaction to its substance, and they have laid it down as an inflexible rule that the mere form is immaterial, but that it is the substance which must be considered. No case is to be judged by what the parties appear to be or represent themselves to be doing, but by the transaction as disclosed by the whole evidence; and, if from that it is in substance a receiving or contracting for the receiving of usurious interest for a loan or forbearance of money the parties are subject to the statutory consequences, no matter what device they may have employed to conceal the true character of their dealings." (27 R. C. L. p. 211.)

See, also, to the same effect, Commonwealth v.

Donoghue, 250 Ky. 343, 63 S. W. (2d) 3, 89 A. L. R. 819; Commonwealth Farm Loan Company v. Caudle, 203 Ky. 761, 263 S. W. 24; Locknane v. U. S. Savings & Loan Company, 103 Ky. 265, 44 S. W. 977, 19 Ky. Law Rep. 1984. Many other similar authorities might be cited, but we deem it unnecessary to encumber this opinion by further citation of authorities which are merely cumulative.

The trial court rendered a memorandum opinion which is filed with the record in which it was strongly indicated that the court was of the opinion that the plan devised by the defendant is a subterfuge intended to circumvent the law prohibiting anyone from engaging in making small loans without first acquiring a license; but the court denied the injunction upon the ground that the case does not fall within that class which can be restrained in a civil action—it not being a public nuisance endangering public health or endangering the morals of the community, and, that if defendant has violated the Statute there is sufficient law to punish him by criminal prosecution as provided in the Small Loan Statute. Briefly stated, the basic reason for the refusal of the injunction was that the plaintiff has adequate remedy at law, and the defendant is entitled to a trial by jury on the question of its guilt or innocence of any violation of the statute.

Having concluded that the defendant company's operations are illegal, for the reasons stated, the question to be determined is whether or not injunctive relief can be had in this class of cases.

It is the general rule that relief by injunction is not the proper remedy where the complaining or injured party has an adequate remedy at law. However, there are numerous exceptions to the rule. In Kentucky State Board of Dental Examiners v. Payne, 213 Ky. 382, 281 S. W. 188, it is held that an injunction will lie to prevent the practice of dentistry without a license, notwithstanding such practitioner is liable to penalties imposed by the statute. It may be conceded that the practice of dentistry involves the elements of danger to health and life while no such elements are involved in the present case; but, that opinion is not based solely upon that ground. The court quoted with approval from the case of In re Debs, 158 U. S. 564, 15 S. Ct. 900, 39 L.Ed. 1092, as follows (page 387, 281 S. W. page 190):

"The Supreme Court of the United States, in the case of In re Debs, 158 U. S. 564, 15 S. Ct. 900, 39 L. Ed. 1092, in commenting on the right of the government to maintain an equity action for an injunction, although the violations involved constituted a crime, said: 'Every government, intrusted, by the very terms of its being, with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. The obligations which it is under to promote the interest of all, and to prevent the wrongdoing of one resulting in injury to the general welfare, is often of itself sufficient to give it a standing in court.' Prior to that statement, it was said in the opinion that the government had a property right in preserving the unmolested carrying of the United States mail under contracts it made for the purpose, but the court also said, 'We do not care to place our decision upon this ground alone,' and that statement was immediately followed by the above excerpt from the opinion."

The court also referred to the case of State v. Lindsay, 85 Kan. 79, 116 P. 207, 35 L. R. A., N. S., 810, which involves institutions for care and treatment for persons of unsound mind. That case, like the Payne Case, supra, primarily dealt with a question involving health and life, but that opinion is not based upon that question only. It was held in the Kansas case, which was referred to with approval by this court in the Payne Case, supra, that a court is not powerless to prevent the doing of an act merely because it is denounced as a public offense. It is pointed out in that opinion that the obligation of the government to promote the interest of all and to prevent the wrong resulting in injury to the general welfare is often sufficient to give it a standing in the court to obtain an injunction, and where a statute is persistingly and continuously violated, no good reason exists why injunctive relief should not apply, although the subject matter involved may not constitute or amount to a public nuisance.

It is pointed out in the Payne Case, supra, that the

purpose of the statute was not to create a crime, but to provide for the public welfare. We think that principle is applicable to the case at bar. The prevention of crime is not the primary purpose of the Small Loan Law, but it has for its underlying purpose the protection of the public and the public welfare. While the Small Loan Statute provides for a penalty for its violation, yet it is not, strictly speaking, a criminal or penal statute.

The penalty provided for a violation of the statute is a mean, rather than the end, to the enforcement of the statute for the benefit of the general welfare.

Furthermore, it is fundamental that injunction will lie, under a great many circumstances, to prevent the repeated and continuous violation of a penal statute, and to avoid a multiplicity of criminal prosecutions.

It is our conclusion, therefore, that in view of the purpose of the statute and all the facts and circumstances involved, the plaintiff is entitled to the relief sought and the court erred in failing to grant the injunction prayed for in the petition.

Wherefore, the judgment is reversed and remanded for proceedings consistent with this opinion.