**Ed W. HANCOCK, Attorney General, et al., Appellants,**

**v.**

**TERRY ELKHORN MINING COMPANY, INC., et al., Appellees.**

Court of Appeals of Kentucky.

Sept. 28, 1973.

Rehearing Denied Feb. 8, 1974.

Ed W. Hancock, Atty. Gen., David Murrell, Laura Murrell, David C. Short, David D. Beals, Asst. Attys. Gen., Frankfort, Phil-

lip M. Walther, Columbus, Ohio, Jack Lewis, Paintsville, for appellants.

Henry D. Stratton, Stratton & Johnson, Pikeville, J. K. Wells, Wells & Wells, Paintsville, Jerry Grigsby, Department of Highways, Pikeville, for appellees.

CATINNA, Commissioner.

This is an appeal from an order and judgment of the Johnson Circuit Court upholding the validity of special overweight truck permits issued pursuant to KRS 189.-270, denying the right of the Attorney General to intervene in the pending action, and refusing to enjoin violations of load-limit laws and regulations; and a cross-appeal from so much of the judgment as mandatorily enjoined Terry Elkhorn Mining Company, Inc., to maintain certain highways.

A number of citizens and residents of Johnson County, Kentucky, who lived on and near Kentucky Highways 302 and 1107, filed this class action seeking to enjoin Terry Elkhorn and certain named individuals from hauling coal in trucks on these roads whose weight violated the load limits placed on them by the Highway Department.

The complaint in Count 1 sought a recovery of money damages; however, this count was subsequently dismissed. Count 2 sought to enjoin temporarily and permanently the use of the roads by coal trucks whose gross weight, including load, exceeded 30,000 pounds, the maximum weight for a Class B highway as set by the commissioner of the Department of Highways.

Count 3 sought to enjoin the operation of overloaded trucks on the roads in that such operation constituted a public nuisance, with the homes and residences along the roads being damaged by the vibration caused by the trucks, together with the dust and grime created thereby. It was stated that such illegal use of the roads was a disruption of the peaceful and law-ful utilization of the property belonging to the residents.

Counsel from the Attorney General's office was present at all hearings held on the claims seeking injunctive relief. However, he did not attempt to intervene until much later when a motion was filed asking that he be permitted to intervene, along with which motion there was tendered a separate complaint on behalf of the Attorney General as an official of the Commonwealth.

The record in this proceeding almost defies comprehension. Counsel for the Attorney General aptly stated: "Procedurally this is a confused case," characterizing the handling of the case as being "informal" or "casual." An effort was made to implead the Department of Highways. The order and judgment of the court denied the Attorney General the right to intervene but did make the Department of Highways a party to the action.

Every step of the proceeding was objected to by counsel for Terry Elkhorn. Although counsel could not find time to introduce evidence when the hearings were held, he did find time to file a motion to intervene on behalf of 380 people, which motion of some 92 pages consisted of 258 separate paragraphs. Upon the granting of leave to intervene, an answer and counterclaim 353 pages long was filed by the intervenors, who consisted of all the employees of Terry Elkhorn, the trucking companies, the truck owners and truck drivers, the owner and operator of the tipples, and their respective spouses and children.

Although numerous points are cited as grounds for reversing or affirming the judgment, we are of the opinion that answers to four questions are dispositive of the issues in this litigation: (1) Did the Attorney General have the right to intervene? (2) Were the overweight permits issued by the Highway Department, pursuant to KRS 189.270 and its Regulation HIWA-TC-P1, valid? (3) Should the

court have enjoined the continued violation of the load-limit laws of the Commonwealth? (4) Did the trial court have the authority or jurisdiction to mandatorily enjoin Terry Elkhorn to maintain portions of Highways 302 and 1107?

Subsequent to the filing of this action, the court assigned it for a hearing upon the issue of injunctive relief. Hearings were held on September 8, 1970, September 14, 1970, September 24, 1970, and November 6, 1970. Counsel for Terry Elkhorn was present and participated in all hearings. Terry Elkhorn now claims that the court deprived it the right to introduce evidence and thereby denied it its constitutional right to due process of law. We do not find that Terry Elkhorn or the other defendants were denied the right to introduce evidence at any of the hearings. On September 8, 1970, appellants introduced a number of witnesses on the question of whether the coal trucks being operated on 302 and 1107 exceeded the statutory load limits and whether their operation constituted a public nuisance. At the conclusion of appellants' evidence, counsel stated to the court that he was of the opinion that the evidence as introduced was sufficient to allow the court to grant the injunctive relief requested. Terry Elkhorn did not offer any evidence, counsel stating at that time that they had nothing further to offer. However, counsel for Terry Elkhorn prevailed upon the court to continue the hearing so that he might look into the law on the right of the parties to maintain a class action. The hearing was continued until September 14, 1970, at which time counsel for Terry Elkhorn filed a rather lengthy transcript of a hearing conducted by the Highway Department on overweight trucks and filed its first overweight permit issued by the Highway Department under KRS 189.270.

The record shows that prior to this time Terry Elkhorn did not have a permit. Counsel for Terry Elkhorn insisted that he wanted to put on proof in regard to the question of a temporary injunction, and it was agreed by counsel at that time that he would take or have proof ready for taking within ten days from that date which would have been September 24, 1970. As the permit issued under KRS 189.270 was for a period of ten days, expiring on September 24, the court continued the hearing until that date.

On September 24, there was a prolonged argument about the validity of permits under KRS 189.270, in the course of which counsel for Terry Elkhorn informed the court that the Highway Department was, at the expense of Terry Elkhorn, repaving parts of Highways 1107 and 302 and that the work would be completed within ten days. The overweight permit also had been renewed. The court indicated that the hearing would be set over until such time as the repaving of the highways was completed. Thereupon Terry Elkhorn refused to put on any evidence, but rather asked that the taking of the evidence be passed to the hearing date, October 2, 1970, which the court announced would be the final hearing, and all parties were instructed to have ready for submission any and all matters they wanted the court to consider.

The hearing on October 2, 1970, apparently was continued, although there is nothing in the record to show what happened. Another hearing was held on November 6, 1970. This hearing consisted of extensive arguments on the right of the Attorney General to intervene. The appellants put on additional evidence to show that the new road was being damaged by the heavy trucks. Counsel for Terry Elkhorn objected rather strenuously and said that he was not prepared for an evidentiary hearing as he had no idea one has intended. This court notes, however, that at the two previous hearings Terry Elkhorn had unequivocally promised to produce its evidence at the "next" hearing.

■ This has been a rather long recitation of what this court considers a corollary factual matter, but it definitely estab-

lishes in the opinion of the court the fact that Terry Elkhorn was not deprived its right to introduce evidence, but rather that counsel refused to introduce evidence on its behalf. By way of a postscript we might add that Terry Elkhorn's brief sets out what evidence would have been introduced if it had not been deprived of that right. We note that every item of evidence mentioned in the brief is in this record by the rather lengthy and repetitious statements of counsel, and the court is not unaware of the evidence upon which Terry Elkhorn intended to rely.

It is not denied that the trucks hauling Terry Elkhorn's coal on Kentucky Highways 302 and 1107 all exceeded the "posted" load limit of 24,000 pounds. Terry Elkhorn admitted that the trucks were overweight denying, however, that they exceeded the 73,280 pounds designated by the special permits. Employees of the Department of Motor Transportation testified that they had never weighed a truck on either of said highways which was not overweight.

None of the offending drivers or truck owners was ever convicted of operating in excess of the legal load limit. Counsel for Terry Elkhorn, in stating the case to the court, said: "Many of the defendants have been previously indicted for operating overweight trucks, but of the many warrants and indictments which reached trial, not one has resulted in a conviction and the majority of such trials resulted in acquittal of the defendant." Counsel had already admitted that all of the trucks exceeded the legal load limit, while denying that the load limit of the special permits was violated. Counsel for Terry Elkhorn further argued in the brief that he would have been able to introduce evidence to show that all warrants and citations against the appellees for violating weight-limit statutes brought to trial before a Johnson County jury resulted in acquittals. An employee of the Department of Motor Transportation testified that some of the trucks he had weighed exceeded the posted load limit of 24,000 pounds by as much as 49,000 pounds and that the trucks were so heavily loaded that on occasions the scales being used were caused to sink into the asphalt pavement.

Sections of the blacktop surface of Highways 302 and 1107 were completely destroyed by the continued disregard of the laws establishing load limits on these roads. Employees of the Department of Motor Transportation testified that the roads were in a horrible shape. Residents along the roads testified that the blacktop surface had been destroyed and now consisted mostly of "red dog," a by-product of surface mining.

Terry Elkhorn admits the destruction of the roads and says that it paid the Department of Highways the cost of rebuilding that which had been destroyed by its trucking operations.

The trucks were so loaded that coal spilled off the beds of the trucks and onto the highways and the shoulders of the roads in violation of KRS 189.150.

The first issue raised is the right of the Attorney General to intervene. The Attorney General appeals from the judgment of the lower court denying him the right to intervene. The trial court got the "cart before the horse" in holding: "For the present time the motion for the Attorney General to intervene as counsel for the plaintiffs is overruled." The Attorney General is not attempting to intervene as counsel but rather in his capacity as an official of the Commonwealth and as its chief law officer. The trial court seems to have considered the fact that as other agencies of the Commonwealth of Kentucky were parties the Attorney General should not intervene, as it was his duty to represent them and, therefore, his intervention created a conflict of interest. We do not have before us the question of whether this conflict should be resolved by the courts or by the Governor under KRS 12.-100.

■ Anciently, the Attorney General was the chief legal adviser of the king charged with the duty of representing him in all legal matters, civil and criminal, in which the king was involved. The king was the state and all functions and powers were vested in him. Therefore, the Attorney General in representing the king was in effect representing the state. Although presently the Attorney General is vested with those powers he had under the common law, the source of his authority and his consequent obligations have been materially changed. When this country promulgated its Declaration of Independence, the writers of that instrument in discussing the inalienable rights of man stated: "That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed, * * *." Thus, the source of authority of the Attorney General is the people who establish the government, and his primary obligation is to the people.

KRS 15.020 designates the Attorney General as the chief law officer of the Commonwealth and all its departments, commissions, and agencies and sets out the duties required of him as such chief law officer. This section contains the following statement: " * * * and shall exercise all common law duties and authority pertaining to the office of the attorney general under the common law, except when modified by statutory enactment."

7 Am.Jur.2d, Attorney General, Section 6, page 6, in discussing the powers and duties of the Attorney General, states the common-law duties of the Attorney General to be, among other things:

" * * * and could institute equitable proceedings for the abatement of public nuisances which affected or endangered the public safety or convenience and required immediate judicial interposition. Such being the nature of the rights and duties that attached to the position in its inception, it is generally held that in the exercise of his common-law powers, an attorney general may not only control and manage all litigation in behalf of the state, but he may also intervene in all suits or proceedings which are of concern to the general public."

CR 24.01 provides that anyone shall be permitted to intervene in an action where he claims an interest relating to the property or transaction which is the subject of the action, and is so situated that the disposition of the action may as a practical matter impede or impair his ability to protect that interest unless, of course, his interest is adequately protected by existing parties.

■ The individuals who filed this action really had two interests that they were seeking to protect, the first being their personal interests in regard to their homes and the protection and enjoyment of their property, while the second was really a public interest involving their concern over the continued destruction of the state highways by overweight trucks. There was also concern regarding the safety of the traveling public on the particular highways. The trial court, upon numerous occasions, expressed concern about the safety and welfare of children in school buses being operated over these roads. The Attorney General, as chief law officer of this Commonwealth, charged with the duty of protecting the interest of all the people, the traveling public, the school children in the school buses, and the very existence of the roads, had such a vital interest in this litigation that he had a right to intervene at least insofar as the public issues advanced in the action were involved.

The second issue concerns the validity of the special overweight permits. Terry Elkhorn operated a surface mine in Johnson County and transported the coal it produced over public highways to nearby tipples. This coal was hauled in very large trucks which, when empty, almost exceeded the load limit established for the highways being used. When loaded they far exceeded the legal limit, with some of them being

overweight by as much as 49,000 pounds. This flagrant violation of the laws of the Commonwealth continues. However, subsequent to the filing of this action, Terry Elkhorn obtained a special overweight permit from the Department of Highways permitting the continued operation of overweight trucks on Highways 302 and 1107, so long as the trucks did not exceed a gross weight of 73,280 pounds.

We are faced with the question of whether the Department of Highways had the right to issue such special overweight permits and, if it did have such right, whether there was an abuse of discretion in the issuing of the permits under the circumstances outlined in this proceeding.

In order for us to clearly understand the duties and obligations of the Department of Highways, as well as the truck operator, it is necessary that we review certain statutes and regulations of the Department of Highways.

KRS 189.221 provides:

"No person shall operate on any highway, except such highways as may be designated by the commissioner of highways under the provisions of subsection (1) of KRS 189.222, any of the following trucks, trailers or vehicles":

\* \* \* \* \* \*

"(4) Any truck, semitrailer truck or truck and trailer unit which exceeds 18,000 pounds gross weight, including the load; \* \* \*."

KRS 189.222 provides:

"(1) The commissioner of highways in respect to highways which are a part of the state-maintained system, by official order, may increase on designated highways or portions thereof, the maximum height, length and gross weight prescribed in KRS 189.221, if in the opinion of said commissioner, the increased height, length and weight designated by him are justified by the strength, safety and durability of the designated highways, and said highways do not appear susceptible to unreasonable and unusual damage by reason of such increases; and said commissioner is authorized to establish reasonable classification of such roads and to fix a different maximum for each classification. However, in no event shall any motor truck or tractor semitrailer combination, including any part of the body or load, exceed the following dimensions and weights":

\* \* \* \* \* \*

"(c) Weight, 18,000 pounds per single axle, with axles less than 42 inches apart to be considered as a single axle; 32,000 pounds on two (2) or more axles in tandem arrangement which are spaced 42 inches or more apart and less than 120 inches apart. In no event shall any single axle in any arrangement exceed 18,000 pounds or 600 pounds per inch of the aggregate width of all the tires on a single axle, whichever is less. In no event shall the total gross weight of the vehicle and load exceed 73,280 pounds; \* \* \*."

The commissioner of highways, pursuant to the authority of the above section of the statute, proceeded to classify roads in the Commonwealth as Classes AAA, AA, A, and B. The weight limit on Class AAA roads was fixed at 73,280 pounds, while on Class B roads the load limit was fixed at 30,000 pounds.

KRS 189.230 provides that the Department of Highways, under certain designated conditions and after proper notice, may prescribe a load limit lower than that fixed under other sections of the statute. In this case the load limit on Highways 302 and 1107, although Class B roads, had been fixed by the department at 24,000 pounds. The record indicates that there were some bridges on these roads with a posted load limit of five tons.

The Legislature realized that there could be certain emergency conditions or other circumstances which would require the op-

eration of a motor vehicle in excess of the load limits as fixed under the previously quoted statutes. To remedy this situation it adopted KRS 189.270 which reads as follows:

"(1) The department may prescribe, by orders of general application, rules and regulations for the issuance by it of permits for the operation of motor trucks, tractors, semitrailers and trailers, whose gross weight including load, height, width or length exceeds the limits prescribed by this chapter or which in other respects fail to comply with the requirements of this chapter. Permits may be issued by the department for stated periods, special purposes and unusual conditions, and upon such terms in the interest of public safety and the preservation of the highways as the department may, in its discretion, require. The department shall require, as a condition to the issuance of the permit, that the applicant pay a reasonable fee, to be fixed by it, and may require that the applicant give bond, with approved surety, to indemnify the state or counties against damage to highways or bridges resulting from use by the applicant. The operation of motor trucks, tractors, semitrailers or trailers, in accordance with the terms of any such permit shall not constitute a violation of this chapter if the operator has the permit, or a copy of it, authenticated as the department may require, in his possession.

(2) No person shall operate any motor truck, tractor, semitrailer or trailer, in violation of the terms of the permit."

We would like to emphasize at this point that the statute under which the so-called overweight special permits are granted provides specifically that the department is to give due consideration to public safety and the preservation of the highways, and we place special emphasis on the fact that the enabling statute requires the department to consider the preservation of the highways as a basic premise upon which

such overweight permits may be issued. This requirement has been continuously and openly disregarded, for in the case of the special overweight permits issued here, there resulted not the preservation of a highway but the complete destruction of a blacktop surfaced state road to the detriment and danger of the traveling public, including the children of the community traveling to and from school on school buses.

The department, in compliance with KRS 189.270, adopted Regulation HIWA-TC-P1 which reads as follows:

"Section 1. Special permits to permit the movement of gross weights and gross dimensions in excess of the weights and dimensions specified by statutes and regulations will be issued by the Department of Highways when, in the discretion of the department, such movement is necessary to provide transportation for specified cargo in the interest of the health, welfare and economy of the people. Even such permit shall be limited to designated portions of the State Maintained Highway System and stated periods of time. A separate permit will be required for each vehicle involved in such movement. Permits will not be transferable from one vehicle to another.

"Section 2. Applications for overload and over-dimension permits shall be made to the Department of Highways. The application shall state the purpose of the movements for which a permit is requested, the portion of the State Maintained Highway System to be used, the cargo to be hauled, the period of time needed to complete the movement, and the identity of the vehicles to be used. A fee of fifteen dollars will be paid for each permit issued.

"Section 3. The applicant shall give bond with approved surety in an amount specified by the Department of Highways to cover each motor vehicle for which a permit or permits are issued. Said bond shall be for the purpose of indemnity to

the Commonwealth of Kentucky, through its Department of Highways, against any damage to highways and bridges resulting from the operation of any motor vehicle under authorization of such permits. The amount of the bond shall not be less than $1,000.00 to cover each vehicle.

"Section 4. Permits are valid during daylight hours only from Monday through Saturday noon, except for those periods before, during, and after the following holidays: New Year's Day; Memorial Day; Independence Day; Labor Day; Thanksgiving Day; Christmas Day. In connection with these holidays, travel is not permitted from noon the preceding day until daylight of the next permissible day. If the holiday occurs on Sunday the restricted period will extend from noon of the preceding Friday to daylight the following Tuesday. If satisfactory proof of an emergency is furnished the Permit Section, Division of Maintenance, Frankfort, Kentucky, the Permit Section may authorize moves during the restricted hours. The term 'daylight hours' means the period from one-half hour before sunrise until one-half hour after sunset, but it does not include such period or part thereof when atmospheric conditions render visibility lower than is ordinarily the case during such daylight hours."

We have concluded that overweight permits issued under circumstances found in this case are void, as they are not permitted by the statute. It is evident that KRS 189.270 does not grant the Department of Highways *carte blanche* authority to issue overweight permits. Placing this section of the statutes in a proper perspective with KRS 189.221, 189.222, and 189.-230, we can but conclude that KRS 189.270 was designed to take care of emergency or unusual situations only. If this were not true, then it was an empty gesture on the part of the Legislature to pass KRS 189.-221, 189.222, and 189.230 when they are completely negated by the interpretation now being placed on KRS 189.270. If we follow the construction of this statute as it is presently being enforced, then there would be no necessity for any type of load limits, highway classification, or otherwise, for all these laws would be overridden by a special overweight permit issued under KRS 189.270. It is obvious that the special permit was only for use in emergency or unusual situations and was not an instrument that could be issued to and used by a person in the day-to-day operation of a business.

The primary purpose of KRS 189.270 was discussed by this court in Ashland Transfer Company v. State Tax Commission, 247 Ky. 144, 56 S.W.2d 691 (1932), wherein we said:

"* * * The required rules and regulations operate on all applicants alike, and they are required to be based upon the necessity of granting such permits 'for special purposes,' for 'stated periods,' to meet 'unusual conditions,' and with the view of conserving the interest of public safety, and the preservation of the highways. The 'special purposes' and 'unusual conditions' are to be determined by the highway commission, having regard for the safety of the public and the preservation of the roads. While the statute does not employ the word 'emergency,' yet it describes one, and which is a situation or condition brought about unexpectedly and not usually happening. * * *."

This being the rule, the statutory requirements to be met before the special overweight permits may be granted have been totally disregarded in the permits issued to Terry Elkhorn. It is an undisputed fact that the highways were torn up and badly damaged and that the traveling public was substantially endangered. The total disregard of these statutory requirements was more than sufficient to render the special overweight permits void. Conceivably, there could be situations where

the special overweight permit might be granted under the regulations adopted by the department. However, even here the department completely disregarded its rules in issuing the special overweight permits. For example, the rules require that a specific cargo be designated and, yet, in none of the permits before us has any cargo been designated other than to say that the permit is for transportation of overweight loads. Also a separate permit is required for each vehicle involved in the movement; yet, the Terry Elkhorn permits designate vehicles listed on an attached schedule, usually two pages, listing anywhere from eighteen to twenty vehicles, one permit therefore being used to authorize the operation of more than one truck.

Section 2 of the regulation requires that an application be filed which shall state the purpose of the movement, the portion of the state highway to be used, the cargo to be hauled, the period of time needed to complete the movement, and the identity of the vehicle to be used. There is not in this record any application filed by Terry Elkhorn containing the information required by the regulation. The so-called permits as issued are on a printed form headed "Application and Permit for Overweight and/or Over-Dimension Vehicles." Yet, there is nothing by way of application thereon other than at the bottom of the page granting the permit there is a line stating, "This permit, with all its conditions, is hereby accepted," and a place for the general contractor to sign. Many of the permits issued to Terry Elkhorn are not signed here, and this court can see no way this instrument can be construed as an application or, for that matter, even as a permit granted pursuant to the terms of KRS 189.270 and the regulation adopted thereunder.

For these reasons the special overweight permits are void and of no force and effect.

The third issue questions the propriety of the court's refusal to enjoin the opera-

tion of the overweight trucks. There is no denial in the record that trucks hauling Terry Elkhorn coal and traveling over Highways 302 and 1107 were all overloaded and in violation of the legal load limit applicable to these highways. Terry Elkhorn admits through counsel that the loaded trucks all weighed in excess of 30,000 pounds but says that none of them exceeded the 73,280 pounds allowed under the special overweight permits. Yet, there is one citation in the record which shows that a truck hauling Terry Elkhorn coal had a gross weight of 84,000 pounds. It is also admitted that these trucks were loaded to the top of the bed and banked on so that coal spilled off onto the right-of-way all along the route, that they ran day and night, were large and extremely noisy, were a source of constant annoyance to residents along the route, and constituted an extremely serious hazard to the traveling public in its attempt to use the damaged roads. The record establishes that the local law-enforcement agencies were unable to cope with this condition, as is evidenced by the fact that no operator of an overweight truck had ever been fined or convicted in Johnson County.

It is true that we have held upon a number of occasions that the commission of a crime will not be enjoined, as the statute itself constitutes an injunction. However, even though the activity complained of is illegal, if it constitutes a public nuisance injunctive relief will be granted. This court is of the opinion that the operation of the trucks hauling Terry Elkhorn coal in the manner described in the record definitely constituted a public nuisance. We have held that a noisy business operated at night in a residential community was a nuisance, although the business itself was not a nuisance; that a disorderly crowd at a place of public amusement may be a nuisance; and that the playing of a brass band at night in a residential section was a nuisance. Palestine Building Association v. Minor, 27 Ky.Law Rep. 781, 86 S.W. 695

(1905). See also Commonwealth v. Mc-Govern, 116 Ky. 212, 75 S.W. 261 (1903).

■ The authority of the Attorney General to maintain a proceeding to enjoin the activity complained of in this action is seriously questioned by Terry Elkhorn. However, the Attorney General has always had the right to maintain a proceeding to enjoin public nuisances. Repass v. Commonwealth, 131 Ky. 807, 115 S.W. 1131 (1909); Goose v. Commonwealth, 305 Ky. 644, 205 S.W.2d 326 (1947).

Terry Elkhorn further argues that injunctive relief was not available to any of the parties because they were hauling within the limits fixed by the special overweight permits. However, at the time of the filing of this action and prior to that date they were operating without a permit and consequently in violation of the load-limit statutes. It was admitted that during this time the operators of overweight trucks were not punished by the local courts. Where such violations are continuous and deliberate, we have said:

" * * * it is fundamental that injunction will lie, under a great many circumstances, to prevent the repeated and continuous violation of a penal statute, and to avoid a multiplicity of criminal prosecutions." Commonwealth v. Continental Co., 275 Ky. 238, 121 S.W.2d 49 (1938). See also Commonwealth v. Anderson, Ky., 237 S.W.2d 860 (1951).

The property owners involved in this litigation sought their injunctive relief upon the ground of Terry Elkhorn's activities constituting a public nuisance and .also upon the ground granted them under KRS 281.790. This particular section of the statute is found in the chapter of the Kentucky Revised Statutes headed "Motor Carriers" which created the Department of Motor Transportation to regulate common carriers in Kentucky and their use of the highways. Terry Elkhorn argues that since this particular section is found in the chapter on Motor Carriers it could apply only to violations of sections of this particular chapter.

KRS 281.790 reads as follows:

"At the instance of the department of motor transportation or of any person having an interest in the subject matter, the courts of this state may enjoin any person from violating any of the provisions of this chapter *or other chapters relating to the operation or taxation of motor vehicles,* or any order, rule, regulation or requirement of the department relating to such vehicles." (Emphasis ours.)

■ An examination of this particular section of Chapter 281 clearly indicates that the Legislature intended to provide injunctive relief in regard to the violation of any of the provisions of any chapter of the statutes relating to the operation of motor vehicles.

As this section of the statute first appeared in Chapter 63 of the 1950 Acts, it read as follows:

"At the instance of the Department of Motor Transportation or of any person having an interest in the subject matter, the courts of this State may enjoin any person from violating any of the provisions of this Chapter relating to common carriers or contract carriers, or any order, rule, regulation or requirement of the department relating to such carriers."

It is readily apparent that the section as originally adopted applied only to what is now Chapter 281 of the Kentucky Revised Statutes. However, KRS 281.790 was amended in 1962 by adding "or other chapters relating to the operation or taxation of motor vehicles" and deleting all references to "common carriers" or "contract carriers." Thus, the right of injunctive relief was enlarged so that it is available on the violation of any section of any chapter of the statutes regulating motor vehicles, including Chapter 189.

We are of the opinion that the citizens of Johnson County who filed this action, as well as the Attorney General of the Commonwealth, had such an interest in the subject matter of this litigation that they were entitled to avail themselves of the injunctive relief afforded by KRS 281.790. The trial court should have enjoined the continued operation of the overweight coal trucks, and by overweight we mean those which exceeded the load limits established by KRS 189.221 and by the commissioner pursuant to the authority of KRS 189.222.

Terry Elkhorn cross-appeals from so much of the judgment as mandatorily enjoins it to maintain those parts of Highways 302 and 1107 used by Terry Elkhorn trucks. We have examined the record rather closely and at no place do we find a motion for this relief. However, the action of the court was not questioned by Terry Elkhorn or any of the other parties to the action. Terry Elkhorn moved for a modification of the judgment, but this was confined to a request that the court clarify the requirements as to repairs and maintenance and allocate the expense so that all other coal-truck operators would be required to pay their pro rata part.

Terry Elkhorn now objects to the injunction because it places an inequitable burden upon it as there are other coal companies using overweight trucks on the road who should be required to contribute to this maintenance. This court is of the opinion that Terry Elkhorn has very little grounds for complaint insofar as the equities of the mandatory injunction are concerned. In one of the pleadings filed by Terry Elkhorn, we find this statement:

"* * * they own and possess overweight permits furnished by the Commissioner of Highways, Commonwealth of Kentucky, for hauling on the roads complained of by the Plaintiff, and in no event is the Plaintiff entitled to any injunctive relief so long as this permit is in full force and effect."

It was strenuously argued throughout the trial that these permits took Terry Elkhorn "off the hook," so to speak, and deprived the other parties of their injunctive relief because now their illegal actions had become legal. In relying upon the permits, Terry Elkhorn finds itself "hoisted upon its own petard," when it objects to the mandatory injunction requiring it to maintain the roads. The permit as issued to Terry Elkhorn by the Department of Highways reads in part as follows:

"This permit is issued pursuant to the provisions of KRS 189.270 for increased gross but not increased axle weights and with the distinct understanding that the vehicles may use it for transporting overweight loads on the designated routes; however, the Applicant is held responsible for all damages to existing roads, streets and bridges due to the transportation of overweight loads by Applicant on the above mentioned road or roads. The General Contractor must maintain and restore said roads, street and bridges to the condition that existed at the time hauling began, and to the satisfaction of the District Engineer."

Thus, the court in requiring Terry Elkhorn to maintain the roads is doing nothing other than directing that Terry Elkhorn perform an act that it had already contracted to perform as a condition precedent to the issuance of the overweight permit, which forestalled the granting of injunctive relief.

We do not feel that Terry Elkhorn should be relieved of any contractual obligation assumed under the overweight permits granted because we now hold them to be void. Therefore, the mandatory injunction of the trial court shall remain in full force and effect until such time as Terry Elkhorn has repaired those sections of Kentucky Highways 302 and 1107 used by overweight trucks hauling its coal, the highways to be repaired to the extent of placing them in the same condition that ex-

isted at the time of the entry of the judgment by the lower court.

The judgment is reversed with directions that a new judgment be entered consistent with this opinion.

All concur.